Filed 11/23/15  P. v. Schutz CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068484 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1200223) |
| MARK ALAN SCHUTZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Jeffrey J. Prevost, Judge.  Affirmed in part and reversed in part with directions.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton, Seth Friedman, and Sabrina Y. Lane-Erwin, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Mark Alan Schutz was charged by second amended information with 15 counts of grand theft (Pen. Code, § 487, subd. (a); counts 1-5 & 7-16); misdemeanor petty theft (Pen. Code, § 488; count 6); felony money laundering (Pen. Code, § 186.10, subd. (a); count 17); and making false statements in tax returns (Rev. & Tax. Code, § 19705, subd. (a); counts 19-20). The second amended information further alleged Schutz took property of a value exceeding $200,000 in the commission of counts 1, 2, 3, 4 or 5 (Pen. Code, § 12022.6, subd. (a)(2)) and committed two or more related offenses charged under counts 1 through 20, a material element of which was fraud or embezzlement and which involved a pattern of related felony conduct that involved the taking of more than $500,000 (Pen. Code, § 186.11, subd. (a)(2)).[1]

The jury found Schutz guilty of all counts and the enhancements true. The court at sentencing denied probation and sentenced Schutz to prison for seven years.

On appeal, Schutz contends his grand theft convictions on counts 8 and 10 must be reversed because the victim knew, or through the exercise of reasonable diligence should have known, of facts giving rise to these offenses more than four years before criminal proceedings commenced. Schutz also contends, and the People concede, his misdemeanor petty theft conviction on count 6 must be reversed for lack of timely commencement of criminal prosecution. Finally, Schutz contends the court abused its discretion and thus erred when it denied probation and sentenced him to prison.

---

[1]     Unless otherwise noted, all further statutory references are to the Penal Code.

2

As we explain, we agree with the parties and reverse Schutz's conviction on count 6, misdemeanor petty theft. In all other respects, we affirm the judgment of conviction.

OVERVIEW

Daniel Leigh testified at all times relevant he owned about 80 businesses involved in real estate construction and development. Leigh met Schutz in or about 2003 or 2004. Schutz, who had an electrical contractor's license, in late 2004 made a business proposal to Leigh after a company with whom Schutz had done business filed for bankruptcy. Schutz represented to Leigh that the projects from the bankrupt company could be transferred to businesses owned by Leigh and that Schutz could obtain some of the assets of the bankrupt company at a very low price.

Leigh testified he was then interested in expanding his business into public-sector contracting. After conducting due diligence, Leigh agreed to go into business with Schutz. In late January 2005, they formed an electrical contracting corporation called CAM/BK, Inc, dba Tri-City Electric (CAM/BK or company), with a corporate office in Temecula, California. Leigh and Schutz were the only two members of the board, and Leigh was named CEO and Schutz president, of CAM/BK. As relevant here, DeRicci Keller was appointed corporate secretary, and Dale Northup CFO, of CAM/BK. Leigh testified Keller and Northup previously had worked for his other businesses.

In addition to the typical formalities in setting up a business, Leigh testified the board of CAM/BK resolved that the signature of two of the company's officers were required to write and deposit checks, enter into contracts, and open and close bank accounts. Leigh testified this requirement was important to him as a "check[s] and

3

balance" system within CAM/BK because this was his first time doing business with Schutz. The record shows the company established a checking and savings account at a bank in Temecula, in which Leigh, Schutz and two other officers were listed on the bank's signature card.

As president of CAM/BK, Schutz's responsibilities were to manage the day-to-day operations of the company; to identify potential projects; to prepare bids for the projects; and if the company obtained those projects, to manage them. Leigh testified he routinely met with Schutz to discuss various projects and whether the company would bid on them. Leigh noted he considered the "risk return relationship" and other factors, including the economy and the number of outstanding performance bonds, in determining whether the company should bid on a project.

CAM/BK began operations in February 2005. According to Leigh, the company lost money in 2005 and 2006 but started to "break even" in 2007. CAM/BK also did not build any schools, which was part of the original business model for the company. However, in 2007 and 2008 the company successfully bid on various projects and, as a result, incurred exposure for performance bonds of approximately $10 to $12 million.

Leigh testified he, one or more of his businesses, his wife and their family trust guaranteed the performance of CAM/BK's bonds, as did Schutz. According to Leigh, Schutz alone then did not have the financial means to obtain the bonds needed for the projects sought by CAM/BK.

Leigh explained that, if a project resulted in $10 million in revenue but because of increased costs, poor bidding or other factors the project actually cost $12 million to

4

complete, the bonding company would pay the $2 million overrun and then seek payment from the guarantors. As such, Leigh testified it was "important" for him and his family to ensure the company was a "functioning business."

Leigh testified he received and reviewed the financial records, the job list and cash flow projections, of CAM/BK provided by Schutz. Leigh's review included the canceled checks of CAM/BK as well as its monthly financial statements. In addition, the books of CAM/BK were audited annually by a certified public accountant.

Leigh became suspicious of Schutz in the "first half of 2007" when Schutz gave himself a $30,000 pay raise without first informing Leigh. Leigh discovered the pay raise from company payroll records. Leigh testified he had made several requests for these records before Schutz finally provided them.

The minutes from the July 17, 2007 meeting of the board of CAM/BK show the payroll issue was addressed. Although Leigh agreed to Schutz's pay raise, Leigh testified he then decided he needed to "spend more time paying attention" to the business operations of the company. Leigh thus offset the $30,000 increase to Schutz with a $30,000 increase to his own management company in order to monitor Schutz and the company more closely. The July 17 minutes also noted that Leigh was having difficulty obtaining various company records from Schutz, including those related to payroll, benefits and banking, despite Leigh's numerous requests for such records/information.

Leigh testified that during this same general time frame he discovered "canceled checks" endorsed by Schutz that lacked the required second signature. Leigh also spoke with an individual during this time frame that had been in a prior business relationship

with Schutz. According to this individual, Schutz allegedly took money from the individual's company.

In December 2007, Leigh discovered Schutz was holding on to checks paid to CAM/BK rather than depositing them into the company's bank account. Leigh prepared a memorandum to Schutz dated December 27, 2007 stating his displeasure with Schutz's decision to hold the checks.

In a February 11, 2008 email, Keller requested that Schutz provide financial data to support his position he needed to "hold[] the checks." This email also referenced a January 27, 2008 memorandum reminding Schutz to provide the "requested financials" of CAM/BK.

The February 20, 2008 minutes of the meeting of the CAM/BK board show Schutz replaced Northup as CFO of the company and Leigh was named assistant CFO. In explaining why he then decided to become assistant CFO, Leigh testified, "I was concerned about the prior activities -- financial activities in regards to the taxes and the items that I mentioned before. So my concern taking the CFO -- I'd rather be an Assistant CFO so he [i.e., Schutz] had to bounce things off of me, as opposed to being the CFO, who technically has liability for the financial recording and financial accuracy of the company."

The February 20 minutes also show that Schutz was thereafter required to provide Leigh the general ledger and check register of the company in "PDF format"; that Schutz was reminded of the requirement of two signatures on all checks; that Schutz in response stated he was having difficulty obtaining signatures from Leigh; that Leigh was still

6

having some difficulty obtaining the various financial records of the company; and that Schutz left the board meeting early, completed the meeting by telephone and later protested a portion of the minutes requiring him to provide Leigh with various company documents.

Leigh testified he told Schutz in March or April 2008 that he wanted to "wind down the affairs" of CAM/BK or that Schutz could buy his interest in the company. According to Leigh, Schutz did not appear interested in either alternative, as Schutz kept telling Leigh, " 'Everything is going to be fine, everything will be great, don't worry about it, the economy will be better.' " As a result, Leigh on March 18, 2008 sent a letter to the bonding company stating that going forward, neither he nor his companies nor his spouse nor their trust would guarantee the completion bonds on CAM/BK projects. Leigh testified at the time, CAM/BK still had about $10 to $12 million worth of work outstanding subject to the original guarantee.

After Leigh sent the March 18 letter to the insurance bonding company, Schutz expressed an interest in buying Leigh's 50 percent interest in the company. As a result, they engaged a CPA who valued the company at $1.2 million as of April 30, 2008. Because the valuation did not include April 2008 data, Leigh testified the CPA finished the company valuation in or about June 2008, which information Schutz then used in an attempt to obtain a bank loan. In or about July or August 2008, Schutz told Leigh he was unable to obtain the loan.

Although Schutz was unable to buy Leigh's interest in the company and although Leigh wanted to wind down the company, Schutz told Leigh he wanted to continue using

7

the "Tri-Citi Electric" name. Leigh vehemently objected, as he believed Schutz's doing so would create confusion for vendors and others. In or around August 2008, Leigh and Schutz met to discuss a "wind-down plan" created by Schutz.

Leigh testified that under the plan, CAM/BK would not take on any new projects and would wind down its affairs. The plan was based on certain cash flow projections as various company projects were completed. According to Leigh, he had a "number of sit-down face-to-face conversations" with Schutz regarding the wind down. During these meetings, Schutz not once raised the issue of the company (or its dba) doing "side jobs" while it wound down.

Leigh testified he became concerned in early 2009 that Schutz was not following their wind-down plan after Schutz provided him with additional information showing the plan was "significantly different" than the original plan. According to Leigh, this information showed "hundreds of thousands of dollars" in variations for the company's projects, which suggested to Leigh that Schutz was using the company to do various "side jobs" rather than wind down the company as they had agreed.

As a result, Leigh testified he visited in or about February 2009 the company's office. Prior to his visit, Leigh had discovered that projects the company was projected to make a profit on were losing money, that projects were running behind schedule and that Schutz was not laying off employees as they had discussed.

Leigh testified Schutz was present when he arrived at the CAM/BK office in February 2009. Schutz initially stated he had to leave for a meeting. In response, Leigh asked for a key to the office, as Leigh did not have one. Leigh told Schutz he would

8

make a copy of the key and would lock up the office after he completed his review of the company's financial records and contracts. According to Leigh, Schutz then appeared "very nervous."

Leigh testified that during his review of the company's records, he discovered "significant irregularities" in the business including learning for the first time that Schutz's daughter was on the company payroll even though she was attending college in San Diego. According to Leigh, Schutz neither asked if his daughter could be on the payroll nor ever told Leigh she was employed by the company.

Leigh testified that he also found other "irregularities," including company jobs that were omitted from the company "job sheet" and a new bank account opened by Schutz in CAM/BK's name. Leigh also found Schutz was continuing to employ individuals who were responsible for preparing bids for *new* company projects, when Schutz was supposedly winding down the company. Leigh copied various company records before he left the office.

When Leigh confronted Schutz about the jobs not included on the company job list, Schutz claimed that he was doing those jobs in the evenings and/or on weekends and that he was not using any company employees and/or assets to complete them. When asked why his daughter was then on the company payroll, Schutz stated she ran "plans around" for $10/hour, which he claimed was cheaper than paying the prevailing wage.

Leigh testified things came to a head between him and Schutz on or about March 2, 2009. Prior to that date, Schutz had failed to attend several meetings Leigh had scheduled. On March 2, Leigh arranged to meet with a buyer who had expressed interest

in buying some of the assets of CAM/BK. Leigh already had set this meeting a number of times and previously had asked Schutz to have the equipment delivered to the office. However, on the morning of March 2 Schutz again informed Leigh he was unable to make the meeting because he was going to Los Angeles to attend a basketball game.

Leigh testified he decided to make an impromptu visit to the company office that morning. Before doing so, however, Leigh called a locksmith because Schutz had changed the front door lock after Leigh had made a copy of the key. While Leigh was driving to the office, he received a call from the locksmith informing him that Schutz was in the office.

When Leigh arrived at the company office, he found the front door locked. Although Schutz was inside, he refused to open the door. Leigh testified when Schutz finally opened the door, he stood in the doorway and told Leigh, " 'You're not coming in.' " As Leigh pushed his way through the front door, Schutz punched Leigh in the back.

The police were called. After the police arrived, Schutz reluctantly agreed to allow Leigh to copy various company documents, including documents showing projects Leigh did not recognize.

On March 9, 2009, after Schutz again failed to show up for a prescheduled meeting, Leigh went to the company office and found a sign had been posted stating CAM/BK was no longer allowed in, and/or in possession of, the office. In speaking with the landlord, Leigh was told that Schutz had signed a new lease for the office space and that CAM/BK allegedly had relinquished its rights to that space. Concerned he would

10

lose access to the premises, the equipment *and* company information, Leigh inventoried these and other items and moved them into storage under the name of CAM/BK.

On or about May 11, 2009, Leigh had a letter sent to Schutz's home informing Schutz that, effective immediately, he was suspended from "all of his activities in regard[] to the company and that he [was] to have no further contact with employees, vendors, or any of the material of the company." The May 11 letter also stated that Leigh suspected Schutz had engaged in misconduct with respect to the company; that Schutz should turn over all company assets in his possession; and that Schutz was not to use any company funds "in any manner." Leigh testified he transferred all of the assets in the company bank account to a new account he created.

On or about May 15, 2009, Leigh went to one of the banks where Schutz had opened a new account in the name of "CAM/BK/Tri-Citi." Leigh testified that although he presented the bank with records showing he was a 50 percent owner of the company, the bank denied him access because Schutz was the only person named on the account.

As a result of having full access to the company's financial records for the first time, as opposed to the "summary" or incomplete records/information Schutz up to then had been providing, Leigh's accounting department discovered "significant irregularities" that led Leigh to believe Schutz had committed theft.

Keller, at all times relevant Leigh's "legal manager" and an officer of the company, testified she prepared the minutes of the February 20, 2008 board meeting. Keller testified she was present at that meeting when Schutz was named CFO and Leigh assistant CFO. During the meeting, the board passed a series of resolutions, including

11

requiring Schutz (i) to prepare monthly a general ledger and check register in PDF format and (ii) to provide "copies of all payroll and benefits records, lease documents, and banking records." Keller testified that the resolution requiring Schutz to provide these records was necessary because she and Leigh in the past had "trouble" obtaining such information from Schutz. Keller also testified that CAM/BK on March 1, 2008 renewed its general liability, worker's compensation and automobile policy insurance.

After Schutz was suspended in or about May 2009, the board of directors (sans Schutz) authorized the company to sue Schutz. At Leigh's request, Keller reviewed discovery obtained in connection with that suit; information obtained from CAM/BK computers; and additional documents copied from CAM/BK's office. Based on her review of this voluminous information, Keller determined that Schutz had opened up 10 bank accounts at different institutions under various names including "CAM/BK," "Tri-Citi Electric, Inc.," "Tri-City Electric" and in his own personal name; that Schutz owned "Tri-Citi Electric, Inc."; and that while an officer and director of CAM/BK, Schutz used the company to perform various "side projects" that produced revenue that were excluded from the company job list, which revenue Schutz deposited into one or more of the 10 accounts he had opened.

Keller testified her investigation showed that Schutz had entered into a contract dated May 2, 2008—when he was still an officer and director of CAM/BK—for a project that was not on the company job list; that when Schutz bid on the May 2 project he used CAM/BK's contractor's license and general liability and worker's compensation insurance policies; that various employees of CAM/BK worked under the May 2 contract, which

12

labor costs were paid by the company; that CAM/BK also paid material costs of about $25,000 for this project; and that in late-August 2008, "Tri-Citi Electric" was paid about $143,000 for this project, which funds were deposited into one of the bank accounts secretly opened by Schutz.

Keller also testified that her investigation revealed Schutz used company resources and assets to enter into *other* contracts for jobs that also were not included on the company job list. Keller noted many of these jobs were initiated in 2008.

DISCUSSION

A. *Statute of Limitations and Counts 8 and 10*

Schutz contends his conviction on counts 8 and 10 must be reversed because the applicable four-year limitations period set forth in sections 801.5 and 803 ran before the prosecution of such offenses commenced.

As stated in the second amended information, count 8 alleged Schutz "on or about August 24, 2006" violated section 487, subdivision (a) in that he "willfully and unlawfully" defrauded, and/or stole and/or took $2,500 from Leigh and CAM/BK. Count 10 similarly alleged Schutz on or about January 11, 2007 violated section 487, subdivision (a) when he "willfully and unlawfully" defrauded, and/or stole and/or took $24,745.83 from Leigh and CAM/BK. Both counts 8 and 10 involved unauthorized payments from CAM/BK's bank account to a law firm unilaterally hired by Schutz to defend *his* separate business, Tri-City Electric, Inc., under a contract that arose in 2002 (before CAM/BK was even in existence).

13

The record shows the jury was instructed in part as follows with a modified version of CALCRIM No. 3410: "A defendant may not be convicted of Grand Theft . . . unless the prosecution began within four years of the date the crime[] w[as] discovered. The present prosecution began on March 7, 2012. [¶] A crime should have been discovered when the victim or law enforcement officer was aware of facts that would have alerted a reasonably diligent person or law enforcement officer in the same circumstances to the fact that a crime may have been committed. [¶] The People have the burden of proving by a preponderance of the evidence that prosecution of this case began within the required time. This is a different standard of proof than proof beyond a reasonable doubt. To meet the burden of proof by a preponderance of the evidence, the People must prove that it is more likely than not that prosecution of this case began within the required time. If the People have not met this burden, you must find the defendant not guilty of Grand Theft . . . ."

1. Guiding Principles

The parties agree counts 8 and 10 are governed by the limitations period in section 801.5. It provides in pertinent part: "[P]rosecution for any offense described in subdivision (c) of section 803 shall be commenced within four years after discovery of the commission of the offense, or within four years after completion of the offense, *whichever is later.*" (Italics added.) Section 803, subdivision (c) in turn provides: "A limitation of time prescribed in this chapter does not commence to run until the discovery of an offense described in this subdivision. This subdivision applies to an offense punishable by imprisonment in the state prison or imprisonment pursuant to subdivision

14

(h) of Section 1170, a material element of which is fraud or breach of a fiduciary obligation . . . including, but not limited to, the following offenses:  [¶]  (1) Grand theft of any type . . . . "

We note the trial court and the parties used March 7, 2012—the date the felony complaint was filed—as the date prosecution commenced for purposes of the statute of limitations analysis.  However, section 804 provides that "prosecution for an offense is commenced when any of the following occurs:  [¶]  (a) An indictment or information is filed[;]  [¶]  (b) A complaint is filed charging a misdemeanor or infraction[;]  [¶]  (c) The defendant is *arraigned* on a complaint that charges the defendant with a felony[;]  [¶] [or] (d) An arrest warrant or bench warrant is issued, provided the warrant names or describes the defendant with the same degree of particularity required for an indictment, information, or complaint."  (Italics added.)

As noted by the plain language in subdivision (c) of section 804, the filing of a felony complaint alone does *not* commence prosecution of the charges stated in the complaint.  (§ 804, subd. (c); *People v. Terry* (2005) 127 Cal.App.4th 750, 764 [citing §§ 803 & 804 and noting the "filing of a criminal complaint does not generally commence the prosecution of a felony for statute of limitation purposes"].)  However, our independent review of the record shows Schutz waived formal arraignment on March 9, 2012, two days after the felony complaint was filed.  In light of subdivision (c) of section 804, we therefore conclude the prosecution commenced on March 9, 2012.  (See *People v. Posten* (1980) 108 Cal.App.3d 633, 648 [noting "[n]othing in the case law requires reversal or retrial for jurisdictional defects [i.e., the accusatory pleading showed on its

15

face that the statute of limitations had run on various criminal charges,] when those defects are as a matter of law cured on the undisputed record"].)

When, as here, the "statute of limitations issue has been tried to a jury, on appeal the question becomes whether there was substantial evidence to support the jury's implied findings. [Citation.] If there was not, the judgments are reversed." (*People v. Le* (2000) 82 Cal.App.4th 1352, 1361; see *People v. Castillo* (2008) 168 Cal.App.4th 364, 369 [noting when an "issue involving the statute of limitations has been tried, we review the record to determine whether substantial evidence supports the findings of the trier of fact"].) Substantial evidence is evidence that is reasonable, credible, and of solid value. (See *People v. Weddles* (2010) 184 Cal.App.4th 1365, 1368.)

A crime is discovered for purposes of section 803, subdivision (c) when the victim or law enforcement (1) learns of the crime or (2) "learns of facts which, when investigated with reasonable diligence, would make the person aware a crime had occurred. [Citation.]" (*People v. Bell* (1996) 45 Cal.App.4th 1030, 1061; see *People v. Zamora* (1976) 18 Cal.3d 538, 571–572.) Under the second prong, the facts must indicate that a crime, criminal activity or, at a minimum, wrongdoing, has occurred. (*People v. Zamora, supra,* at pp. 571–572.) Facts indicating a loss or other irregularity are not enough by themselves to trigger the running of the limitations period because "[t]he law does not require an employer to investigate an employee absent circumstances that are sufficient to make the employer suspicious of a *crime.*" (*People v. Wong* (2010) 186 Cal.App.4th 1433, 1447, italics added; see *People v. Kronemyer* (1987) 189

16

Cal.App.3d 314, 334 [noting "discovery" for purposes of triggering a period of limitations "calls for awareness of the crime, not merely the loss"].)

The inquiry as to the discovery of the offense is a question of fact for the jury to decide. (*People v. Zamora*, *supra*, 18 Cal.3d at p. 565.) In this regard, a victim's duty to investigate is even less onerous when a fiduciary relationship is involved. (*People v. Crossman* (1989) 210 Cal.App.3d 476, 482 [noting if defendant and victim are in a fiduciary relationship where defendant occupies a "position of trust . . . 'facts which would ordinarily require investigation may not excite suspicion' "].)

2. Analysis

We conclude there is substantial evidence in the record to support the (tacit) finding of the jury that Leigh was not aware of facts on or *before* March 8, 2008—more than four years after commencement of criminal prosecution (see § 804, subd. (c))—that would have alerted a reasonably diligent person in the same circumstances as Leigh that a *crime* was being, or had been committed, by Schutz in connection with his operation of the company.

First, the record shows it was not until Leigh visited the company office in February 2009 that he discovered "significant irregularities" in the business operations of the company. It was only then, after he obtained the key to the company office and independently reviewed company financial and payroll records, that he discovered for the *first* time that: 1) Schutz's daughter was on the company payroll, even though she was attending college in San Diego; 2) the company had successfully bid on jobs that were omitted from the company "job sheet"; 3) Schutz had opened a new bank account in

17

CAM/BK's name; and 4) Schutz continued to employ individuals who were responsible for preparing bids for *new* company projects when Schutz had agreed to wind down the company. Although the record shows Leigh did not learn the full extent of these "irregularities"—including with respect to counts 8 and 10—until sometime after Schutz's suspension in May 2009, we conclude a jury could find under the facts of this case that a reasonably prudent person in Leigh's circumstances was "on notice" in February 2009 of Schutz's potential criminal activity, which we note is within four years from the date prosecution commenced.

Second, at the time of the February 2008 board meeting and for an *extended* period thereafter, the record shows Schutz was "slow" to turn over company financial information requested by Leigh. As a result, the board at that meeting passed a resolution requiring Schutz to put in "PDF format" the general ledger and check register of the company and to provide such information to Leigh on a monthly basis.

Thus, the evidence in the record supports the finding that Schutz was less than forthcoming with company financial information, even on request; that the information he did provide was in summary form and clearly incomplete; and that *if* Schutz had *timely* provided true and accurate information to Leigh—including copies of the checks that were the subject of counts 8 and 10, a reasonably prudent person in the same circumstances then as Leigh would have been alerted to the criminal conduct of Schutz shortly after August 2006 (count 8) and again shortly after January 2007 (count 10), when Schutz then used company assets to pay the legal expenses of *his* separate business. This evidence supports the finding Schutz acted to create the maximum delay in

18

discovery of his criminal conduct. (See *People v. Kronemyer*, *supra*, 189 Cal.App.3d at p. 331.)

Third, the record shows Leigh in mid-February 2008 was then concerned about certain activities by Schutz in *managing* the company, including Schutz's decision to give himself a pay raise, his processing of company checks without the required two signatures and his holding on to checks. Nonetheless, a reasonable jury could find that such concerns, at that point in time, would not have alerted a reasonably prudent person in the same situation as Leigh (i.e., owning about 80 other companies and relying on Schutz, a fiduciary) to the fact Schutz had engaged or was engaging in *criminal* conduct, as opposed to conduct that merely raised concerns over his *management* of the company.

Schutz's appointment as CFO, and Leigh's appointment as assistant CFO, of the company during the February 2008 board meeting further supports the finding Leigh was concerned about Schutz's *management* of the company, as Leigh then sought to become more involved in the business affairs of the company.

Fourth, the record shows when Leigh informed Schutz in mid-March 2008 of his desire to wind down the company because of concerns over Schutz's management of the company and because of the worsening economy, Schutz in response reassured Leigh "everything" would be "fine," the economy was getting "better" and not to worry. A jury could reasonably find that Leigh was entitled to rely in some measure on Schutz's assurances and that such assurances were made to allay Leigh's concerns and suspicions regarding Schutz's operation of the company, thus further delaying the discovery of Schutz's criminal activity. (See *Garret v. Perry* (1959) 53 Cal.2d 178, 181-182 [noting a

19

fact finder "could properly conclude that any suspicions of [the] plaintiff arising from the information he had obtained upon his investigations [regarding the profitability of a ranch bought from the defendant] were allayed by [the] defendant's subsequent reassurances and that under the circumstances . . . [the] plaintiff was not precluded from relying upon what [the] defendant told him," given the defendant had owned the ranch for 20 years and claimed to have "superior knowledge" concerning its profitability].)

Fifth, the record shows that even though Leigh in mid-March 2008 decided to wind down the company, at that point in time he, his businesses, his wife and their trust were still on the hook for about $10 to $12 million in guarantees for the completion bonds previously issued on company projects. Such evidence further supports a finding that Leigh—or a reasonably prudent person in his situation—was not then alerted to *criminal* conduct by Schutz, inasmuch as Leigh then had every incentive to ensure Schutz successfully ran CAM/BK.

Finally, even *if* there is evidence in the record that, if credited, would support a different finding on this issue, it does not change our decision. As noted, the issue of when the statute of limitations commenced was decided by the jury. As further noted, there is substantial evidence in the record to support the finding that criminal prosecution of Schutz on counts 8 and 10 was commenced within four years from the date when a reasonably prudent person would have discovered the criminal conduct—February 2009. As such, the fact there was other evidence in the record that *may* have supported a different or contrary finding is of no consequence on this issue. (See *People v. Little* (2004) 115 Cal.App.4th 766, 771 [recognizing that in determining whether substantial

20

evidence supports a conviction, a court of review does "not reweigh the evidence, resolve conflicts in the evidence, draw inferences contrary to the verdict, or reevaluate the credibility of witnesses"].)

Because criminal prosecution commenced within four years of the discovery of the crimes in counts 8 and 10 and because that finding is supported by substantial evidence, we reject Schutz's contention his conviction on counts 8 and 10 must be reversed under sections 801.5 and 803, subdivision (c).

B. *Statute of Limitations and Count 6*

Schutz next contends, and the People concede, that his conviction on count 6 for petty theft was barred by the one-year statute of limitations set forth in section 802, subdivision (a).[2] It provides in part: "[P]rosecution for an offense not punishable by death or imprisonment in the state prison or pursuant to subdivision (h) of Section 1170 shall be commenced within one year after commission of the offense." Moreover, the delayed discovery provisions of section 803, subdivision (c) are inapplicable as they only apply to felonies.

Here, count 6 alleges Schutz committed petty theft "on or about 2006, 2007, [or] 2008." As such, the statute of limitations expired no later than 2009. (See § 802, subd. (a).) Because Schutz's criminal prosecution commenced on March 9, 2012, we agree with the parties that his conviction on count 6 must be reversed.

---

[2] Count 6 originally was charged as felony grand theft (§ 487, subd. (a)) in connection with the amounts Schutz paid his daughter between 2006 and 2008. The record shows the prosecution at the preliminary hearing failed to present evidence as to the amount his daughter received and, as a result, the court bound over on petty theft.

C. *Denial of Probation*

1. Guiding Principles

" 'All defendants are eligible for probation, in the discretion of the sentencing court [citation], unless a statute provides otherwise.' [Citation.] 'The grant or denial of probation is within the trial court's discretion and the defendant bears a heavy burden when attempting to show an abuse of that discretion. [Citation.]' [Citation.] 'In reviewing [a trial court's determination whether to grant or deny probation,] it is not our function to substitute our judgment for that of the trial court. Our function is to determine whether the trial court's order granting [or denying] probation is arbitrary or capricious or exceeds the bounds of reason considering all the facts and circumstances.' [Citation.]" (*People v. Weaver* (2007) 149 Cal.App.4th 1301, 1311, disapproved on another ground as stated in *People v. Cook* (2015) 60 Cal.4th 922, 939.)

Schutz's eligibility for probation is governed by section 1203.045, which provides that "[e]xcept in unusual cases where the interests of justice would best be served if the person is granted probation, probation shall not be granted to any person convicted of a crime of theft of an amount exceeding one hundred thousand dollars ($100,000)." (§ 1203.045, subd. (a).) Although Schutz recognizes there was a statutory presumption against probation that could only be overcome in an "unusual case," inasmuch as he stole almost $800,000 or about eight times the statutory amount, we note the trial court was not precluded as a matter of law from considering a grant of probation. (See *ibid.*)

Pursuant to California Rules of Court, rule 4.413(b), "[i]f the defendant comes under a statutory provision prohibiting probation 'except in unusual cases where the

22

interests of justice would best be served,' . . . the court should apply the criteria in (c) to evaluate whether the statutory limitation on probation is overcome." California Rules of Court, rule 4.413(c) (Rule 4.413) is divided into two subsections: (1) "Facts relating to basis for limitation on probation," and (2) "Facts limiting defendant's culpability."

As particularly relevant here, Rule 4.413(c)(2) provides the court may consider facts or circumstances that did not amount to a defense but reduce "the defendant's culpability for the offense . . . ." It lists three possible circumstances. The first one concerns a defendant committing crimes "under circumstances of great provocation, coercion, or duress . . . ." (Rule 4.413(c)(2)(A).) This category appears inapplicable here, inasmuch as there is no evidence suggesting Schutz committed the various offenses under any of these three scenarios. To the contrary, the record shows he committed the offenses over the course of *years* and used his position of trust and confidence as an officer and director of CAM/BK to escape detection for as long as possible.

The second category relates to crimes "committed because of a mental condition not amounting to a defense . . . ." (Rule 4.413(c)(2)(B).) Again, this category appears inapplicable because there is no evidence in the record that Schutz suffered from a mental condition or if so, that he could be successfully treated for such a condition on probation.

Finally, in the third category a court may consider whether the "defendant is youthful or aged" and whether he or she "has no significant record of prior criminal offenses." (Rule 4.4.13(c)(2)(C).) We note the Rule does not define what "aged" means. In any event, this factor is the only one that appears applicable to Schutz, inasmuch as this was Schutz's first felony offense and he was 52 years old at the time of sentencing.

23

2. Brief Additional Background

The record shows before sentencing, the court indicated it had received and considered Schutz's probation report, which recommended Schutz be sentenced to prison; the People's sentencing brief, which recommended imposition of a 10-year prison term; Schutz's sentencing brief; two restitution briefs stating Leigh and the company sustained losses of over $1.2 million; a number of letters submitted on Schutz's behalf; and a document entitled " 'Settlement and Restitution Agreement.' "

The record also shows the court at sentencing considered the argument of counsel and the statements of a family member of Schutz and of Schutz himself. With respect to Schutz, he told the court that he had already returned almost $500,000 of the money he stole and that he was remorseful for what he had done, noting he had been "selfish" in committing the crimes.

The record shows the court next invited *additional* argument from counsel regarding whether to impose probation or sentence Schutz to prison. The defense argued the court should impose probation because Schutz was truly sorry, he was committed to make restitution and he was then 52 years of age and had no criminal history. The prosecution argued Schutz should be sentenced to prison, albeit for less than the 23 years four months maximum he faced. In particular, the prosecution noted prison was warranted based on the amount of money Schutz stole and his sophistication in doing so, including using his position of trust in the company to conceal his criminal conduct for years. The prosecution acknowledged Schutz's efforts to make restitution and thus recommended Schutz be sentenced to prison for seven, as opposed to 10, years.

24

With respect to whether Schutz qualified under Rule 4.413(c)(2)(C), the prosecution argued that Schutz was several years younger when he first engaged in the criminal conduct (i.e., years before his sentencing in May 2014), and thus he was not "aged" within the meaning of that subdivision. The prosecution also argued Schutz's lack of criminal history did not reduce his culpability because the lack of any such history allowed Schutz to gain Leigh's trust, which Schutz then abused in committing the various offenses.

In ruling to deny probation, the court noted this was a "difficult case." Although the court found Schutz acted in good faith in his effort to make restitution, the court further found that doing so did not make this an "unusual" case. The court also found that Schutz's age did not make him an "aged" person within the meaning of Rule 4.413(c)(2)(C). The court thus imposed a seven-year prison term, noting it was not going to impose the 10-year term previously sought by the People in light of Schutz's effort to make restitution.

3. Analysis

Our task here is not to reweigh the evidence, but rather to determine whether the court abused its broad discretion in denying Schutz probation. We discern no such abuse.

First, the record shows the court was well aware of its discretion to impose probation in this case, which the court carefully considered *before* sentencing Schutz to prison. Second, this was a presumptive prison case, as Schutz himself recognizes. (See § 1203.045, subd. (a).)

25

Third, the court in the exercise of its discretion found Schutz was not "aged" for purposes of Rule 4.413(c)(2)(C). Although the court did not state the reason for this particular finding, we note it was not required to do so. (See *People v. Zamora* (1991) 230 Cal.App.3d 1627, 1637 [concluding a " 'trial court may minimize or even entirely disregard mitigating factors without stating its reasons' "].) In fact, we note Rule 4.413(c) uses the word "may," which suggests this provision is permissive and not mandatory. (See *People v. Stuart* (2007) 156 Cal.App.4th 165, 178 [same].)[3]

Fourth, we discern no abuse of discretion, much less a clear abuse of discretion, in sentencing Schutz to prison in light of the amount of money he stole, the circumstances under which he did so and his efforts over the *years* to hide his ongoing criminal conduct.[4] (See *People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1091 [noting " '[a]n order denying probation will not be reversed in the absence of a clear abuse of discretion' "].)

## DISPOSITION

We reverse Schutz's conviction on count 6, petty theft (§ 488), because

---

[3] Given Schutz was 52 years old at the time of sentencing and given the use of the contrasting terms "youthful" and "aged" in Rule 4.413(c)(2)(C), it appears reasonable to conclude Schutz was perhaps "middle-aged," as opposed to "aged," for purposes of this Rule. (See *People v. Salcido* (2008) 166 Cal.App.4th 1303, 1311 [noting that in construing a statute, a court " 'first look[s] to the plain meaning of the words used,' " and noting a court is " 'bound to give effect to a statute according to the usual and ordinary import of those words' "].)

[4] Because the court found Schutz's case was not "unusual," it was not required to consider the factors set forth in California Rules of Court, rule 4.414, which pertain to suitability for probation.

26

prosecution was not timely commenced under section 802, subdivision (a). We thus order the trial court to prepare a corrected abstract of judgment and to forward a certified copy of such to the Department of Corrections and Rehabilitation. In all other respects, the judgment of conviction is affirmed.

BENKE, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.